409 P.2d 742

The STATE of Arizona, and Pima County, State of Arizona, Petitioners,

v.

The SUPERIOR COURT IN AND FOR the COUNTY OF PIMA, State of Arizona, the Honorable Jack G. Marks, Judge of the Superior Court, Division VIII, In and For the County of Pima, Richard Abbuhl, M.D., and the Treasurer of Pima County, Arizona, Respondents.

2 CA–CIV 165.

Court of Appeals of Arizona.

Jan. 12, 1966.

Rehearing Denied Feb. 2, 1966.

Review Denied March 1, 1966.

MOLLOY, Judge.

Howard Leo White was found to be an indigent by the superior court, and was assigned counsel to defend him in a criminal proceeding. During preparation of the defense, assigned counsel obtained the services of a medical doctor to examine White, and testify at the trial as an expert concerning chronic alcoholism, the essence of White's defense. Following the trial, request was made for an order requiring the county to pay for the services rendered by the doctor in defense of the indigent, White. After a hearing, the court entered an order directing the county treasurer to pay the sum of $75.00 to the doctor. By petition for a writ of certiorari, this court has been asked to determine whether the superior court acted within its jurisdiction in ordering such payment.

■ Petitioners contend that the Constitution and laws of Arizona do not provide for such payment and that, therefore, the order directing payment to the doctor, being outside the jurisdiction of the superior courts, was a nullity. Respondents, on the contrary, maintain that although no statutory provision supplying indigent defendants with expert witnesses is to be found in this state, recent decisions of the United States Supreme Court compel the conclusion that indigents are entitled to "effective assistance of counsel," that to be effective, counsel may find it necessary to recruit the services of experts, and that, therefore, the superior court has the inherent power to secure such experts at county expense to guarantee the constitutional rights of the indigent to equal protection of the laws, and due process of law.

The Arizona Constitution guarantees certain rights to an accused in criminal prosecutions:

Ariz.Const. art. 2, § 24, A.R.S.

"Rights of accused in criminal prosecutions

"In criminal prosecutions, the accused shall have the right to appear and defend in person, and by counsel, to de-

Norman E. Green, County Atty., Pima County, Jacqueline Schneider, Deputy County Atty., Tucson, for petitioners.

Anthony B. Ching, Tucson, for respondents.

mand the nature and cause of the accusation against him, to have a copy thereof, to testify in his own behalf, to meet the witnesses against him face to face, to have compulsory process to compel the attendance of witnesses in his own behalf, to have a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed, and the right to appeal in all cases; and in no instance shall any accused person before final judgment be compelled to advance money or fees to secure the rights herein guaranteed."

Rule 163, Rules of Criminal Procedure, 17 A.R.S., implements the Constitution by providing for the exercise of an indigent accused's right to counsel, and A.R.S. § 13–1673 makes provision for compensation to assigned counsel for the personal services he renders in the defense of the indigent accused. Other statutes provide for transcripts of trial records for indigent defendants who wish to prosecute an appeal of a conviction (A.R.S. § 13–1714); and for compensation for counsel assigned to prosecute an appeal of an indigent defendant (A.R.S. § 13–1721). Likewise, the county is required to pay the fee, determined by the superior court to be reasonable, of an appointed expert in the conduct of a sanity hearing (A.R.S. § 13–1674).

Statutory provision for the payment of expert witness fees for the indigent defendant is somewhat conspicuous by its absence in our code, unless contained within the provision for the payment of "services" of counsel (A.R.S. § 13–1673), a contention not made in this proceeding but advanced and answered negatively in the decision, released this date of State of Arizona v.

Superior Court, 2 Ariz.App. 466, 409 P.2d 750. At least five of our sister states have made specific statutory provision for expert assistance to indigents without cost to the indigent.[1]

The principal authority, apart from legislative silence, in support of the petitioners' position is the decision of the Arizona Supreme Court in the case of State v. Crose, 88 Ariz. 389, 357 P.2d 136 (1960). The case holds that the state is not mandated by constitutional provisions to provide a " * * * full paraphernalia of defense," and that medical experts are part of this paraphernalia not provided at public expense.

■ The position of the Arizona Supreme Court does not admit of ambiguity, and is binding upon this court unless recent interpretations of the United States Constitution by the United States Supreme Court have rendered the position of the Arizona Supreme Court untenable. At the outset we might observe that we are not impressed with respondents' summary dismissal of the Crose decision simply on the basis that it is "Pre-Gideon."

The United States Supreme Court, in Gideon v. Wainwright, 372 U.S. 335, 83 S. Ct. 792, 9 L.Ed.2d 799 (1963), held that the right to the assistance of counsel was a fundamental human right and applicable to the states through the Fourteenth Amendment but it does not deal with the contention at hand that the right to counsel includes the employment and testimony of expert witnesses.

Other decisions dealing with the necessity for fairness to the accused in order to satisfy the mandates of the Fourteenth Amendment and traditional notions of "fair play" seem equally or more applicable.[2]

---

1. Florida: Fla.Stat.Ann. § 932.30 (1944); Illinois: Ill.Ann.Stat. ch. 38, § 730 (Smith-Hurd 1935) (includes 1961 amendment); New York: N.Y.Code Crim.P. § 308 (McKinney 1958); Pennsylvania: Pa.Stat.Ann. tit. 19, § 784 (Purdon 1930); South Dakota: S.D.Code § 36.0109 (1939).

2. E.g., Douglas v. People of State of California, 372 U.S. 353, 83 S.Ct. 814, 9 L. Ed.2d 811 (1963) (indigent's right to counsel on first appeal); Griffin v. People of State of Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (indigent's right to transcript on appeal); Eskridge v. Washington State Board

Of these decisions, respondents depend especially on Griffin v. People of State of Illinois and Douglas v. People of State of California, supra note 2.

In Griffin, the Supreme Court required the State of Illinois to provide without cost a transcript of the testimony of the trial for appellate purposes. There is language in the opinion significant to the problem before us:

"Providing equal justice for poor and rich, weak and powerful alike is an age-old problem. People have never ceased to hope and strive to move closer to that goal. This hope, at least in part, brought about in 1215 the royal concessions of Magna Charta: 'To no one will we sell, to no one will we refuse, or delay, right or justice. * * * No free man shall be taken or imprisoned, or disseised, or outlawed, or exiled, or anywise destroyed; nor shall we go upon him nor send upon him, but by the law of the land.' These pledges were unquestionably steps toward a fairer and more nearly equal application of criminal justice. In this tradition, our own constitutional guaranties of due process and equal protection both call for procedures in criminal trials which allow no invidious discriminations between persons and different groups of persons. Both equal protection and due process emphasize the central aim of our entire judicial system—all people charged with crime must, so far as the law is concerned, 'stand on an equality before the bar of justice in every American court.' Chambers v. [State of] Florida, 309 U.S. 227, 241, 60 S.Ct. 472, 479, 84 L.Ed. 716. See also Yick Wo v. Hopkins, 118 U.S. 356, 369, 6 S.Ct. 1064, 1071, 30 L.Ed. 220.

* * * * * *

"Appellate review has now become an integral part of the Illinois trial system for finally adjudicating the guilt or innocence of a defendant. *Consequently at all stages of the proceedings the Due Process and Equal Protection Clauses protect persons like petitioners from invidious discriminations.* See Cole v. [State of] Arkansas, 333 U.S. 196, 201, 68 S.Ct. 514, 517, 92 L.Ed. 644 * * *." (Emphasis added) Griffin v. People of State of Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956)

Related to the instant case, the question may be asked: Has the use of expert witnesses become such an integral part of the Arizona trial system that failure of the state to provide such assistance to an indigent constitutes an invidious discrimination?

In Douglas v. People of State of California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed. 2d 811 (1963), the Supreme Court held that the California practice whereby the District Court of Appeals, to which a direct appeal from judgment of conviction of crime is a matter of right, "goes through" the record of trial and decides whether any good could be served by appointment of counsel constituted an invidious discrimination against an indigent defendant denying him equal protection of law guaranteed by the Fourteenth Amendment. In the course of its opinion, the majority said:

"But it is appropriate to observe that a State can, consistently with the Fourteenth Amendment, provide for differences so long as the result does not amount to a denial of due process or an 'invidious discrimination.' Williamson v. Lee Optical of Oklahoma, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563;

of Pardons, 357 U.S. 214, 78 S.Ct. 1061, 2 L.Ed.2d 1269 (indigent's right to the same full appellate review as non-indigent who can afford a transcript); Draper v. State of Washington, 372 U.S. 487, 83 S.Ct. 774, 9 L.Ed.2d 899 (1963) (indigent's right to sufficiently complete

record to provide for full and fair appellate review); Lane v. Brown, 372 U.S. 477, 83 S.Ct. 768, 9 L.Ed.2d 892 (1963) (indigent's right to transcript for purpose of appellate review). See also U.S.C.A. Constitution, Amendment VI, p. 416.

Griffin v. [People of State of] Illinois, supra [351 U.S.] p. 18, 76 S.Ct., p. 590. Absolute equality is not required; lines can be and are drawn and we often sustain them. See Tigner v. [State of] Texas, 310 U.S. 141, 60 S.Ct. 879, 84 L.Ed. 1124; Goesaert v. Cleary, 335 U.S. 464, 69 S.Ct. 198, 93 L.Ed. 163.

\* \* \* \* \* \*

"The present case, where counsel was denied petitioners on appeal, shows that the discrimination is not between 'possibly good and obviously bad cases,' but between cases where the rich man can require the court to listen to argument of counsel before deciding on the merits, but a poor man cannot. There is lacking that equality demanded by the Fourteenth Amendment where the rich man, who appeals as of right, enjoys the benefit of counsel's examination into the record, research of the law, and marshalling of arguments on his behalf, while the indigent, already burdened by a preliminary determination that his case is without merit, is forced to shift for himself. The indigent, where the record is unclear or the errors are hidden, has only the right to a *meaningless ritual,* while the rich man has a meaningful appeal." (Emphasis added) Douglas v. People of State of California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963)

The question posed by Douglas as it applies to our inquiry is: Does the failure of the state to provide at its expense expert witnesses to indigents in criminal cases reduce the trial of an indigent to a "meaningless ritual?"

If these questions posed by the Griffin and Douglas decisions require affirmative answers in this case, a distressing shadow is cast upon our entire heritage of criminal justice. But we would be remiss in our

duties were we to predicate our decision upon a reluctance to repudiate the past. It is the mark of both courage and practicality to admit past mistakes and the Supreme Court of the United States has refused to permit false idols to be enshrined. And, following the example of our highest court, we should not be deterred by the anticipation that a favorable ruling on the respondents' contention might open prison cells for those previously convicted without the benefit of the assistance demanded here.[3] With this preface we reexamine the custom, well-established in this land, of not providing to indigents at state expense the services of expert witnesses to assist in the defense. Our inquiry, however, is circumscribed by our office. We are not determining the limits of tolerance of a legislator with power to act in the premises, but rather the limits of tolerance set by the constitutional law of our land.

At the outset, it must be recognized that our constitutional foundations tolerate and even encourage private enterprise and private property. With this system come inequalities of infinite variety. Many of these intimately affect the opportunity of the individual for health and happiness. Some intrude even into the sanctity of the courtroom itself. Any such intrusion is distasteful, but the complete insulation of the processes of justice from this insidious influence may be possible only by the complete destruction of private property itself, a feat achieved to this date by no government, no matter how totalitarian.

To illustrate the difficulty of achieving a completely aseptic courtroom, we pose certain additional questions: Does the employment in this case of a general medical practitioner at a cost of $75.00 eliminate the undesirable influence under discussion? Would a man of means have employed a psychiatrist or perhaps a nationally or even

---

3. There is a statement in "Gideon's Trumpet," by Anthony Lewis, that: "By January 1, 1964, [less than ten months after the rendition of Gideon] nine hundred seventy-six prisoners had been released outright from Florida penitentiaries, the authorities feeling that they could not be successfully retried. Another five hundred were back in the courts, and petitions from hundreds more were awaiting consideration." (p. 205)

internationally recognized expert on the effects of alcohol upon the human mind? Would the testimony of such expertise possibly have resulted in an acquittal or a "hung" jury in this case?

And as this is the right to effective counsel being discussed, is there a difference in the effectiveness of counsel? And does the availability of more effective counsel bear some relationship to the financial resources available for defense?[4] And what about the cost of private investigators, both to investigate the facts of the case and the individual backgrounds of the jury panel? What about laboratory testing? Elaborate mock-ups of the scene of the crime? Intricate technical demonstrations for the courtroom?

Experience in the trial court leads to answers to these questions which indicate that complete equality between the rich and the poor is a chimera well sought after, but unattainable.

Before passing judgment upon whether an additional step should be taken in pursuit of this elusive goal, we should remember that we are considering only one of many inequalities that permeate the courtroom to a greater or lesser degree. Those who have sat through many trials cannot be but impressed with the unfortunate dichotomy between the accused whose physical appearance, demeanor and deportment is immediately attractive to the jury and one who in such departments is unable to strike a responsive chord with his fellowmen.

And, inevitably, we have been led to a consideration of the influence of the jury, the heart and soul of our criminal law system, which brings with it certain inequalities which may compensate for other inequalities. The fact that the state must prove its case to the unanimous satisfaction of twelve men and women in order to win the contest, while the defendant need only point out a reasonable doubt to prevail, is an inequality between the prosecution and the defense which is a background for our appraisal of the inequality under consideration. It is well within the province of jurors under our system to vote for acquittal for no better reason than that an indigent defendant has not been provided with independent expertise. The jury system brings with it into the courtroom the natural sympathy for the underdog which is a part of our culture. The rich, by definition, have few peers. That the rich themselves may be discriminated against to some degree under our jury system is a matter of reasonable conjecture.

And, in order to keep this defect in our judicial system in proper perspective, it must be remembered that there is an important difference in the duties of counsel, between the prosecution and the defense, which injects compensating inequality into the system. Counsel for the prosecution as public officers sworn to uphold the law are duty bound to protect the rights of the innocent as well as prosecute the guilty and are duty bound to reveal and not to conceal evidence tending to exonerate a defendant.[5] There is no comparable duty

---

4. Justice Frankfurter concurring in Griffin v. People of State of Illinois:
"Law addresses itself to actualities. It does not face actuality to suggest that Illinois affords every convicted person, financially competent or not, the opportunity to take an appeal, and that it is not Illinois that is responsible for disparity in material circumstances. Of course a State need not equalize economic conditions. A man of means may be able to afford the retention of an expensive, able counsel not within reach of a poor man's purse. Those are contingencies of life which are hardly within the pow-

er, let alone the duty, of a State to correct or cushion."

5. Canon 5 (para. 2) of Canons of Professional Ethics of the American Bar Association reads:
"The primary duty of a lawyer engaged in public prosecution is not to convict, but to see that justice is done. The suppression of facts or the secreting of witnesses capable of establishing the innocence of the accused is highly reprehensible."
The Cannons of Professional Ethics are adopted by A.R.S. § 32–267(8) and Rules

devolving upon counsel for the defense.[6] On defense motion, a trial court has inherent power to order disclosure of evidence in the hands of the prosecution, including evidence resulting from scientific testing by the state. State ex rel. Helm v. Superior Court of Cochise County, 90 Ariz. 133, 367 P.2d 6 (1961). Conversely, the state has no complementary right to discover evidence in the possession of the defendant. 23 C.J.S. Criminal Law § 955 (1), p. 787. It seems apparent that the expenditure of public monies for expertise by the prosecution is more likely to bring facts to light than like monies expended by the defense.

■ And if the prosecutor should violate his trust, upon the discovery of any evidence concealed, or, for that matter, coming to light after trial when there has been no wrongful conduct on the part of the prosecutor, a new trial can be granted. Rules 307, 308 and 311, Rules of Criminal Procedure. Conversely, if there has been a trial and an acquittal, regardless of how much evidence was concealed by the defendant and/or his counsel, no motion for new trial is possible. Rule 307, Rules of Criminal Procedure; Ariz.Const. art. 2, § 10.

There are other inequalities, less pertinent perhaps, between the rights and privileges of the prosecution as opposed to those of the defense [7] which are peripheral to the inquiry of whether the particular inequality under consideration renders the trial of an indigent who has not been provided with expert witnesses so unfair as to be violative of our constitutional guarantees.

Though expertise undoubtedly has more of a place in the modern day court than in yesteryear, there are few indications in gross statistics that criminal trials as a whole are less fair to the accused than before. The fact that convictions for crime in this country appear to be lagging considerably behind the increase in reported crime [8] may be some evidence that the scales have not shifted greatly in favor of the state by reason of whatever shift has taken place in the importance of expert testimony.

There is an awesome responsibility entailed in writing new concepts, such as advocated by the respondents here, into

29 and 45 of the Arizona Supreme Court, 17 A.R.S. A violation thereof subjects the perpetrator to disbarment or other disciplinary action.

6. Canon 5 deals with "The Defense or Prosecution of Those Accused of Crime." This commands counsel to undertake the defense of persons accused of crime " * * * regardless of his personal opinion as to the guilt of the accused * * *" and " * * * to present every defense that the law of the land permits * * *." Canon 37 commands the lawyer to preserve his client's confidences.

7. E.g.: The prosecution in Arizona is required to give advance notice of all witnesses it intends to call by endorsing their names on the indictment or information. Rule 153, Rules of Criminal Procedure. No such requirement is imposed upon the defense. The defendant may take the deposition of an out-of-state witness by written interrogatories but the state may not. A.R.S. §§ 13–1901 et seq. Upon a guilty verdict, the accused may appeal

(A.R.S. § 13–1713) but there is no appeal for the state that can reverse a verdict of acquittal. A.R.S. § 13–1712, Ariz.Const. art. 2, § 10. Privileges to suppress evidence illegally obtained are properties of the defense rather than the prosecution, Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

8. Uniform Crime Reports (1959), Federal Bureau of Investigation at p. 10 states: "From 1950 to 1959, persons found guilty in court increased only 36% or slightly more than one-half the rise in crime." Uniform Crime Reports, 1959–1964, inclusive, from this same agency indicate that there has been a 58% increase in major crime between 1958 and 1964, while United States population was increasing 10%. The rate of clearance by arrest of reported crime has declined gradually from 27.1% in 1959 to 23.9% in 1964, and the rate of conviction of those charged with crime has gradually declined from 74.9% in 1959 to 68.4% in 1964.

our constitutional structure. Once so placed, the concept becomes irreversibly a part of our system of justice and the American way of life. The cost may be great, both economically and socially, in paying full service to the new part of our "heritage," but there is little possibility of retracing once such a step has been taken.

The judiciary does not bear the total burden in this area; the legislative responsibility is clear. That our own legislature is not without social conscience is indicated by its provisions for the payment of attorney's fees for indigent defendants long before Gideon and before the federal government moved in this direction.[9]

The judiciary is not alone in having awesome responsibilities. The legislative branches of our governments must balance the ever-increasing demands upon the public treasuries for national defense, education, courts, police protection, child welfare, care of the mentally and physically ill, and social justice in its broadest aspects. The extent to which expenditures in one area may force reductions in other areas should be more within the knowledge of legislators than judges.

The door sought to be opened here appears to have broad dimension. Alcoholism is an ever-increasing problem in our society.[10] Examination and testimony in the psychiatric area may have some relevancy as to any crime in which specific intent is an element and there are many such in our Code. Most contested criminal trials offer opportunities for extensive contribution by expertise of various types. Expert testimony by its very nature must usually be obtained from the highly educated and skilled, whose talents demand an ever-increasing price in our economy.

For all of these reasons, we believe that the decision as to whether and to what extent expert testimony is to be provided to the indigent in criminal trials is peculiarly appropriate for the legislative branches of our government to make. We do not find that failure to provide at state expense the expert assistance under discussion renders the trial of an indigent defendant a "meaningless ritual" nor an "invidious discrimination." We hold that State v. Crose is still the law in Arizona.

The order of payment is reversed.

KRUCKER, C. J., and HATHAWAY, J., concur.

9. Ch. 22, Laws of 1927, p. 45, provided for the payment of attorney's fees of not more than $100.00 (since amended to set no limit on discretion of the court, A.R.S. § 13–1673). In federal courts, court appointed counsel were noncompensated until passage of Criminal Justice Act of 1964, 78 Stat. 552.

10. A recent feature article in the Wall Street Journal contained the following: "According to estimates of the National Council on Alcoholism, (NCA), the drinking disease now afflicts about 6.5 million Americans, a sharp increase from 5 million in 1958. Roughly 250,000 new alcoholics join these ranks every year; our national 'drinking problem' is rated second only to that of France. The Department of Health, Education and Welfare now places alcoholism fourth on the list of public health menaces, preceded only by heart disease, mental illness, and cancer.

\* \* \* \* \*

"Nationally it is estimated that of those persons imprisoned for felonies, between 25% and 50% have histories of excessive drinking." Wall Street Journal, vol. 73, No. 119, Friday, December 17, 1965, p. 1, col. 1. Also see "The Rising Tide of Alcoholism," William B. Terhune, M.D., Harper's Bazaar, March 1965; condensed in June 1965 Reader's Digest.