212 P.3d 96

**Christie A. GREEN; Dawn Wyland; Eric Meyer; Rae J. Waters; The Professional Group Public Consulting, Inc., an Arizona corporation, Plaintiffs/Appellants,**

**v.**

**Gale GARRIOTT, in his official capacity as Director of the Arizona Department of Revenue, Defendant/Appellee.**

**Stella Gomez; Cecilia Hernandez; Stefanie Ortega; Kerin Zimmerman; Arizona School Choice Trust, Inc., a private nonprofit corporation, Intervenor–Defendants, Appellees.**

**No. 1 CA–CV 07–0424.**

Court of Appeals of Arizona, Division 1, Department E.

March 12, 2009.

As Amended April 15, 2009.

Sacks Tierney P.A. By Marvin S. Cohen, Scottsdale, and Arizona School Boards Association By Christopher P. Thomas, and Arizona Center for Law in the Public Interest By Timothy M. Hogan, Phoenix, Attorneys for Appellants.

Terry Goddard, Attorney General By Michael F. Kempner, Assistant Attorney General, Phoenix, Attorneys for Appellee.

Institute for Justice Arizona Chapter By Timothy D. Keller, Jennifer M. Perkins, Tempe, and Institute for Justice By William

M. Mellor, Clark M. Neily, III, Arlington, VA, and Thomas A. Zlaket PLLC By Thomas A. Zlaket, Tucson, Attorneys for Appellee–Intervenors.

Alliance Defense Fund By Benjamin W. Bull, Gary S. McCaleb, Bryon J. Babione, Scottsdale, Attorneys for Amicus Curiae School Choice Arizona, Inc.

## OPINION

GEMMILL, Judge.

¶ 1 In this appeal we address whether Arizona Revised Statutes ("A.R.S.") section 43–1183 (Supp.2008), establishing a state income tax credit for scholarship contributions by corporations, contravenes the United States and Arizona Constitutions. For the reasons that follow, we hold that A.R.S. § 43–1183 passes constitutional muster.

## A.R.S. § 43–1183

¶ 2 A.R.S. § 43–1183 establishes a dollar-for-dollar tax credit that is available to any corporation paying Arizona corporate income taxes. The tax credit is given "for the amount of voluntary cash contributions made by the taxpayer during the taxable year to a school tuition organization." A.R.S. § 43–1183(A). A "school tuition organization" ("STO") is defined as:

[A] charitable organization in this state that both:

(a) Is exempt from federal taxation under § 501(c)(3) of the internal revenue code and that allocates ninety per cent of its annual revenue for educational scholarships or tuition grants to children to allow them to attend any qualified school of their parents' choice.

(b) Provides educational scholarships or tuition grants to students without limiting availability to only students of one school.

A.R.S. § 43–1183(Q)(2).

¶ 3 To obtain the tax credit, the corporate taxpayer must, before making a contribution, notify the STO of the total amount of contributions that the taxpayer intends to make to the STO. A.R.S. § 43–1183(D). Before accepting the taxpayer's contribution, the STO must request pre-approval from the Arizona Department of Revenue ("Department") for the amount of the proposed contribution. *Id.* The Department then has twenty days to pre-approve or deny the proposed contribution. *Id.* If the Department approves the contribution, then the STO must notify the corporate taxpayer of the pre-approval, and the taxpayer has ten days after receiving notice of the pre-approval to make the contribution to the STO selected by the taxpayer. *Id.*

¶ 4 The Department is required to permit "the tax credits on a first come, first served basis." A.R.S. § 43–1183(C)(3). The Department is not permitted to allow tax credits "that exceed in the aggregate, a combined total of ten million dollars in any fiscal year," with the tax credit cap to be increased annually by twenty per cent. A.R.S. § 43–1183(C)(1). A tax credit is not permitted "if the taxpayer designates the taxpayer's contribution to the school tuition organization for the direct benefit of any specific student." A.R.S. § 43–1183(I).

¶ 5 Under the corporate tax credit program, STOs are required to use at least ninety per cent of the contributions they receive to provide educational scholarships or tuition grants. A.R.S. § 43–1183(J). STOs are only permitted to provide educational scholarships or tuition grants to students whose "family income does not exceed one hundred eighty-five per cent of the income limit required to qualify a child for reduced price lunches under the national school lunch and child nutrition acts." *Id.*

## PROCEDURAL HISTORY

¶ 6 On September 19, 2006, Christie A. Green, Dawn Wyland, Eric Meyer, Rae J. Waters, and The Professional Group Public Consulting Inc. ("Appellants"), filed a complaint against Gale Garriott, in his official capacity as Director of the Arizona Department of Revenue, seeking a declaration that A.R.S. § 43–1183 is unconstitutional plus injunctive relief enjoining the administration of § 43–1183. Stella Gomez, Cecilia Hernandez, Stefanie Ortega, Kerin Zimmerman, and Arizona School Choice Trust, Inc., moved to

intervene as Defendants, and the superior court granted their motion.

¶ 7 Appellees moved to dismiss Appellants' complaint under Arizona Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted. On March 5, 2007, the trial court granted Appellees' motion.

¶ 8 Appellants timely appealed and we have jurisdiction pursuant to A.R.S. § 12–2101(B) (2003).[1]

## ANALYSIS

¶ 9 "In reviewing motions to dismiss for failure to state a claim, we assume that the allegations in the complaint are true and determine if the plaintiff is entitled to relief under any theory of law." *Sensing v. Harris*, 217 Ariz. 261, 262, ¶ 2, 172 P.3d 856, 857 (App.2007).[2] We apply a de novo standard of review to issues of statutory interpretation. *City of Phoenix v. Harnish*, 214 Ariz. 158, 161, ¶ 6, 150 P.3d 245, 248 (App.2006).

¶ 10 Appellants urge four bases for finding A.R.S. § 43–1183 unconstitutional, arguing

1. In a separate opinion involving the parties to this appeal, we addressed the applicability of A.R.S. § 12–1841 (Supp.2008). *See DeVries v. State*, 219 Ariz. 314, 198 P.3d 580 (App.2008). That opinion did not address the substantive issues we resolve herein.

2. The dissent argues that because Appellants attached various documents to their response to Appellees' motion to dismiss, the trial court should have treated the motion as one for summary judgment. *See infra* ¶ 50. The only documents attached, however, were copies of briefs filed before the United States Court of Appeals for the Ninth Circuit from a separate case. From the trial court's minute entry, it is clear that the court treated Appellees' motion as one for a failure to state a claim. The trial court did not reference the documents Appellants attached and, based upon the court's analysis, it is apparent that the court did not consider Appellants' attachments in rendering its decision. Further, Appellants do not argue that the trial court erred by not treating the proceeding as one for summary judgment. Accordingly, on this record we do not believe the mere attachment of these documents from a separate case to Appellees' response to the motion to dismiss converted the proceeding into one for summary judgment. *See Dube v. Likins*, 216 Ariz. 406, 417 n. 2, ¶ 34, 167 P.3d 93, 104 n. 2 (App.2007) (noting that attachments to motion to dismiss neither added nor subtracted from the deficiency of the pleadings

that the tax credit violates: (1) the Establishment Clause of the United States Constitution; (2) Article 2, Section 12, of the Arizona Constitution; (3) Article 9, Section 10, of the Arizona Constitution; and (4) Sections 20 and 26 of the Arizona Enabling Act, Act of June 20, 1910, ch. 310, 36 Stat. 557. We address each of these arguments in turn.

## Establishment Clause

¶ 11 The Establishment Clause of the United States Constitution states that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend I.[3]

¶ 12 In *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the United States Supreme Court adopted a three-part test to determine the viability of statutes juxtaposed against the Establishment Clause: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster 'an excessive government entanglement with religion.'"[4] (Citation omitted).

and stating that "neither party argues the court erred in not treating the motion to dismiss as a motion for summary judgment. We thus review the trial court's judgment as a motion to dismiss pursuant to Rule 12(b)(6)."). And even if we treated the motion to dismiss as one for summary judgment, our conclusions would not be altered.

3. Even though the plain language of the Establishment Clause addresses only the federal government ("Congress"), the United States Supreme Court has determined that it equally applies to the individual states via the Fourteenth Amendment. *Everson v. Bd. of Educ.*, 330 U.S. 1, 15, 67 S.Ct. 504, 91 L.Ed. 711 (1947). *But see Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 45–46, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (Thomas, J., concurring) (arguing that "the Establishment Clause is a federalism provision, which, for this reason, resists incorporation" through the Fourteenth Amendment).

4. Appellants argue that *Zelman v. Simmons–Harris*, 536 U.S. 639, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002), puts forth a new test for "state programs that provide subsidies for tuition at religious schools." However, a close reading of *Zelman* indicates that the Supreme Court was simply applying the *Lemon* test to the Ohio school voucher program. While we believe *Zel-*

*Purpose*

¶ 13 We need not speculate as to the purpose of § 43–1183, as our legislature included an express purpose: "Pursuant to § 43–223, Arizona Revised Statutes, the legislature enacts § 43–1183, Arizona Revised Statutes, as added by this act, to encourage businesses to direct a portion of their taxes by contributing to school tuition organizations *in order to improve education* by raising tuition scholarships for children in this state." 2006 Ariz. Sess. Laws, ch. 14, § 6 (emphasis added).

¶ 14 Appellants argue that this is not a valid secular purpose, as § 43–1183 is "not restricted, as the *Zelman* program was, to students whose public school options are inadequate, nor is it restricted to students whose parents are without the means to afford payment of private school tuition." We reject this assertion.

¶ 15 First, the *Zelman* court did not rest its finding of constitutionality with respect to the Cleveland statute on the basis that its beneficiaries were lower-income families with inadequate choices—the secular purpose of the Ohio statute was not even in dispute. *Zelman*, 536 U.S. at 649, 122 S.Ct. 2460.

¶ 16 Second, our legislature may act in the absence of the restrictive features identified by Appellants. A system of education, which includes both private and public institutions, stands to gain much by the presence of competition. *See Mueller v. Allen*, 463 U.S. 388, 395, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983) ("[P]rivate schools may serve as a benchmark for public schools, in a manner analogous to the 'TVA yardstick' for private power companies."); *Wolman v. Walter*, 433 U.S. 229, 262, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977) (Powell, J., concurring in part, concurring in judgment in part, and dissenting in part) ("Parochial schools ... often afford whole-

some competition with our public schools; and in some States they relieve substantially the tax burden incident to the operation of public schools. The State has, moreover, a legitimate interest in facilitating education of the highest quality for all children within its boundaries, whatever school their parents have chosen for them."), *overruled on other grounds by Mitchell v. Helms*, 530 U.S. 793, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000).

¶ 17 Finally, the program adopted by our legislature limits scholarship recipients "to children whose family income does not exceed one hundred eighty-five per cent of the income limit required to qualify a child for reduced price lunches under the national school lunch and child nutrition acts." A.R.S. § 43–1183(J). While this qualification does not limit the scholarship recipients to only the very lowest-income families, it evidences a clear desire on the part of our legislature to provide an educational choice to parents who probably could not otherwise afford to send their children to a private school. *Cf. Mueller v. Allen*, 463 U.S. 388, 395, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983) ("An educated populace is essential to the political and economic health of any community, and a state's efforts to assist parents in meeting the rising cost of educational expenses plainly serves this secular purpose of ensuring that the state's citizenry is well-educated."); *Kotterman v. Killian*, 193 Ariz. 273, 278, ¶ 8, 972 P.2d 606, 611 (1999) ("[Private schools] also further the objective of making quality education available to all children within a state.").

¶ 18 We conclude, therefore, that the first prong of *Lemon* is satisfied. *See Mueller*, 463 U.S. at 395, 103 S.Ct. 3062 ("A state's decision to defray the cost of educational expenses incurred by parents—regardless of the type of schools their children attend—

*man* is controlling, we do not believe it pronounced a "new and separate test."

There was no dispute in *Zelman* surrounding the Ohio statute's secular purpose. *Zelman*, 536 U.S. at 649, 122 S.Ct. 2460. Nor was there an issue concerning excessive entanglement. The sole issue in *Zelman* concerning the *Lemon* test was "whether the Ohio program nonetheless has the forbidden 'effect' of advancing or inhibiting religion." *Id.* This, of course, is the second part

of the *Lemon* test. The *Zelman* court went on to discuss neutrality and private choice in the context of the second prong of *Lemon*.

Even if we interpreted *Zelman* as pronouncing a separate test from *Lemon*, an approach we need not take, § 43–1183 nonetheless satisfies *Zelman*: it has a "valid secular purpose," is "neutral with respect to religion," and permits the exercise of "true private choice." *Id.* at 649, 662, 122 S.Ct. 2460.

evidences a purpose that is both secular and understandable.").

## Effect

¶ 19 The central inquiry in *Zelman*—whether the Ohio statute had the "effect" of advancing religion—was whether the program was one that provided "aid directly to religious schools" or was one "of true private choice." *Zelman*, 536 U.S. at 649, 122 S.Ct. 2460. Programs of true private choice do not offend the Establishment Clause: "Three times we have confronted Establishment Clause challenges to neutral government programs that provide aid directly to a broad class of individuals, who, in turn, direct the aid to religious schools or institutions of their own choosing. Three times we have rejected such challenges." *Id.* *Zelman* became the fourth.

¶ 20 Our inquiry thus becomes whether § 43–1183 provides for true private choice. "To answer that question, our decisions have drawn a consistent distinction between government programs that provide aid directly to religious schools, and programs of true private choice, in which government aid reaches religious schools only as a result of the genuine and independent choices of private individuals." *Zelman*, 536 U.S. at 649, 122 S.Ct. 2460 (citations omitted).

¶ 21 The corporate tax credit program does not provide aid directly to religious schools. There are two distinct levels of private choice that "direct the aid to religious schools or institutions of their own choosing." *Id.* The first level of private choice comes directly from the taxpayer. The corporate taxpayer must decide, initially, whether to make a contribution to an STO. This decision is not coerced by the State. Indeed, there is no ultimate financial advantage to the corporate taxpayer in contributing to an STO. If the corporate taxpayer decides to contribute to an STO, it must then select a particular STO. Again, the State is not involved with the selection by the taxpayer of a particular STO. After deciding to contribute to an STO and then selecting a particular STO, the taxpayer must then determine the amount of contribution it intends to make to the STO.

¶ 22 After this series of independent choices, there is yet a second level of private choice: the scholarship recipient and his or her parents. Parents of children who qualify under the program select a school of their choice for their children to attend. Upon selecting a school, the parents then apply for a scholarship or tuition grant from a qualified STO to be applied to the particular school of their choosing. The State is not involved in encouraging parents to choose a sectarian school over a non-sectarian school. Sectarian schools receive aid only after parents, and not the State, have selected sectarian schools to educate their children. The "primary beneficiaries" of the program are the scholarship recipients, not sectarian schools. *Zelman*, 536 U.S. at 651, 122 S.Ct. 2460; *see also Kotterman*, 193 Ariz. at 283, ¶ 26, 972 P.2d at 616 ("The primary beneficiaries of this credit are taxpayers who contribute to the STOs, parents who might otherwise be deprived of an opportunity to make meaningful decisions about their children's educations, and the students themselves. We realize, of course, that the benefits do not end there. The ripple effects can, when viewed through a wide-angle lens, radiate to infinity. But while direct subsidies to sectarian schools may affront the Constitution, 'the Establishment Clause is not violated every time money previously in the possession of a State is conveyed to a religious institution.'") (quoting *Witters v. Wash. Dep't of Servs. for the Blind*, 474 U.S. 481, 486, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986)); *Jackson v. Benson*, 218 Wis.2d 835, 578 N.W.2d 602, 618 (1998) ("In our assessment, the importance of our inquiry here is not to ascertain the path upon which public funds travel under the amended program, but rather to determine who ultimately chooses that path. As with the programs in *Mueller* and *Witters*, not one cent flows from the State to a sectarian private school under the amended MPCP except as a result of the necessary and intervening choices of individual parents.").

¶ 23 In addition to private choice, the Supreme Court in *Mueller, Witters, Zobrest*,[5]

5. *Zobrest v. Catalina Foothills School Dist.*, 509     U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993).

and most recently in *Zelman*, emphasized the importance of neutrality in examining the effect a statute has in advancing or inhibiting religion. As the court stated in *Zelman*, when a program is "neutral with respect to religion and provides assistance directly to a broad class of citizens who, in turn, direct government aid to religious schools wholly as a result of their own genuine and independent private choice, the program is not readily subject to challenge under the Establishment Clause." *Zelman*, 536 U.S. at 652, 122 S.Ct. 2460.[6]

¶ 24 Section 43–1183 is neutral with respect to religion. The statute makes no distinction between sectarian and non-sectarian schools or STOs. This statute is just one of many undertakings by our legislature to provide parents with viable alternatives beyond the traditional public school education. *See, e.g.*, A.R.S. § 15–181 (2002) (creating charter schools "as alternatives to traditional public schools"); A.R.S. § 15–802 (Supp.2008) (authorizing education for home-schooling); A.R.S. § 43–1089 (2006) (providing a personal income tax credit for contributions made to STOs). The tax credit is available to corporate taxpayers without reference to religion. Scholarships created by § 43–1183 are available for students to attend any private school, whether sectarian or otherwise. There is no "financial incentive" for corporate taxpayers to contribute to sectarian STOs, nor is there any such incentive for students to attend religious over non-religious private schools. *Witters*, 474 U.S. at 488, 106 S.Ct. 748 (stating, in the context of the second prong of *Lemon*, that a Washington program "is in no way skewed towards religion" and "creates no financial incentive for students to undertake sectarian education"). "Such incentives '[are] not present . . . where the aid is allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis.' " *Zelman*, 536 U.S. at 653–54, 122 S.Ct. 2460 (quoting *Agostini v. Felton*, 521 U.S. 203, 231, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997)).

■ ¶ 25 In the same vein, Appellants also allege that religious STOs are responsible for distributing more than 70% of the scholarships available through this scholarship program. Mere statistical figures, however, are insufficient for the purpose of demonstrating that a statute has the effect of advancing or inhibiting religion. In *Zelman*, the Supreme Court refused to give any constitutional weight to the statistical figure of 96%, which represented the total percentage of scholarship recipients in the Cleveland program who chose sectarian schools. *Zelman*, 536 U.S. at 658, 122 S.Ct. 2460; *see also Mueller*, 463 U.S. at 400–01, 103 S.Ct. 3062 (rejecting invitation to attach significance to figure that 96% of parents taking tax deductions for tuition expenses did so based upon paying tuition at religious schools). Regardless of whether religious STOs are distributing more than 70% of the scholarships available, such a statistic does not alter the layers of private choice that insulate § 43–1183 from constitutional infirmity. Indeed, Appellants overlook that the 70% figure has nothing to do with State action and is attributable solely to the intervention of *private choices:* corporations selecting a particular STO, and par-

---

**6.** We recognize that in *Zelman*, 536 U.S. at 645, 122 S.Ct. 2460, the Ohio statute at issue did not permit schools to discriminate on the basis of religion. We do not believe, however, that this feature of the Ohio statute was dispositive to the Court's holding. A review of the Court's analysis as a whole reveals that, in addressing the primary effect of the statute, the Court focused on the aggregate of the following features of the Ohio statute: it provided benefits directly to a wide spectrum of individuals, defined only by financial need and residence, *id.* at 662, 122 S.Ct. 2460; it permitted genuine choice, *id.;* it was only one of many undertakings by the State of Ohio to provide educational opportunities, *id.* at 647, 122 S.Ct. 2460; it permitted participation of both religious and non-religious schools, *id.* at 645, 122 S.Ct. 2460; and there was no incentive towards religious schools, *id.* at 650, 122 S.Ct. 2460. Such inquires are the hallmarks of not only *Zelman*, but *Mueller, Witters,* and *Zobrest*— the very cornerstones of *Zelman*. We do not believe the discriminatory bar of the Ohio statute, in and of itself, controlled the outcome in *Zelman*. The Supreme Court analyzed the statute in its entirety to conclude that the statute passed constitutional muster. *Zelman*, 536 U.S. at 662–63, 122 S.Ct. 2460. We do the same here, and viewed as an integrated whole, § 43–1183 does not have the effect of advancing religion.

ents choosing to send their children to sectarian schools. Such private choices are the hallmarks of a constitutionally permissible program. *See* discussion, *supra* ¶¶ 20–22.

■ ¶ 26 Appellants also argue that § 43–1183 violates the Establishment Clause because it permits STOs and sectarian schools to award scholarships "on a religiously discriminatory basis." Under § 43–1183(Q), a "qualified school" is one "that does not discriminate on the basis of race, color, handicap, familial status or national origin," and STOs are defined with reference to being "exempt from federal taxation under § 501(c)(3) of the internal revenue code." A.R.S. § 43–1183(Q)(1)(a), (2)(a). Under § 43–1183, therefore, qualified schools and STOs are not prohibited from discriminating on the basis of religion.

■ ¶ 27 We first note that § 43–1089, which was upheld by our supreme court in *Kotterman*, contains the same definitions for STOs and qualified schools. A.R.S. § 43–1089(G)(2), (3). Also, any religious discrimination that may take place under § 43–1183 is performed by the qualified schools in admitting their students and by the STOs in administering the scholarship funds—not by the State of Arizona. "For a law to have forbidden 'effects' under *Lemon*, it must be fair to say that the *government itself* has advanced religion through its own activities and influence." *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 337, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987). The numerous levels of private choice that exist under the challenged program insulate the State from becoming the actor engaged in any religious discrimination. "Because the program ensure[s] that parents [are] the ones to select a religious school as the best learning environment for their ... child[ren], the circuit between government and religion [is] broken, and the Establishment Clause [is] not implicated." *Zelman*, 536 U.S. at 652, 122 S.Ct. 2460; *see*

*also Mitchell*, 530 U.S. at 809–11, 120 S.Ct. 2530 (plurality opinion) ("If the religious, irreligious, and areligious are all alike eligible for governmental aid, no one would conclude that any indoctrination that any particular recipient conducts has been done at the behest of the government.... For if numerous private choices, rather than the single choice of a government, determine the distribution of aid pursuant to neutral eligibility criteria, then a government cannot, or at least cannot easily, grant special favors that might lead to a religious establishment.").

¶ 28 Given the neutrality of the statute, and the multiple layers of private choice that stand between the legislature's decision to provide a corporate tax credit and the eventual acceptance of scholarship funds by sectarian schools, we do not believe the Establishment Clause has been violated.[7] *See Zelman*, 536 U.S. at 652, 122 S.Ct. 2460.

### Entanglement

■ ¶ 29 Section 43–1183 presents no problems of "excessive government entanglement with religion." *Lemon*, 403 U.S. at 613, 91 S.Ct. 2105 (citation omitted). While the Department does pre-approve intended contributions, there are no criteria for approval that would require the Department to become involved with the religious or non-religious nature of STOs or private schools. Rather, the Department's involvement is merely administerial in nature, ensuring that the statute itself is followed.

¶ 30 For example, the Department is charged with ensuring that the annual "tax credit cap" for contributions does not exceed the allotted aggregate amount. A.R.S. § 43–1183(C)(1). Thus, as part of the pre-approval process, the Department must ensure that the intended contribution will not exceed the tax credit cap. Likewise, STOs must report certain information to the Department by June 30 of each year. A.R.S. § 43–1183(O). However, the information is statistical in nature, to ensure that STOs are complying with

7. "A policeman protects a Catholic, of course—but not because he is a Catholic; it is because he is a man and a member of our society. The fireman protects the Church school—but not because it is a Church school; it is because it is property, part of the assets of our society. Neither the fireman nor the policeman has to ask before he renders aid 'Is this man or building identified with the Catholic Church.' " *Everson*, 330 U.S. at 25, 67 S.Ct. 504 (Jackson, J., dissenting).

the requirements of § 43–1183. Thus, there is no "comprehensive, discriminating, and continuing state surveillance" that would run afoul of the Establishment Clause. *Lemon*, 403 U.S. at 619, 91 S.Ct. 2105. "[R]outine regulatory interaction which involves no inquiries into religious doctrine, no delegation of state power to a religious body, and no 'detailed monitoring and close administrative contact' between secular and religious bodies, does not of itself violate the nonentanglement command." *Hernandez v. Comm'r*, 490 U.S. 680, 696–97, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989) (citations omitted).

¶ 31 In sum, A.R.S. § 43–1183 satisfies the dictates of the Establishment Clause. It has a valid, secular purpose and is neutral towards religion. Section 43–1183 provides tax credits to corporations without reference to religion. It also provides benefits directly to a wide spectrum of individual scholarship recipients, defined only by financial need and prior school attendance. A.R.S. § 43–1183(J). It permits corporate taxpayers to make contributions to STOs based on the genuine choice of the taxpayer. Section 43–1183 also permits parents and students to exercise free choice among various secular and religious educational options. Therefore, a program of true private choice is created. Lastly, § 43–1183 does not create excessive government entanglement with religion. Accordingly, we hold that A.R.S. § 43–1183 does not offend the Establishment Clause.

### Article 2, Section 12 & Article 9, Section 10

¶ 32 Appellants next argue that § 43–1183 violates Article 2, Section 12, and Article 9, Section 10, of the Arizona Constitution.

¶ 33 Article 2, Section 12 states in part: "No public money or property shall be appropriated for or applied to any religious worship, exercise, or instruction, or to the support of any religious establishment." Article 9, Section 10 provides: "No tax shall be laid or appropriation of public money made in aid of any church, or private or sectarian school, or any public service corporation."

¶ 34 In *Kotterman*, 193 Ariz. at 284–88, ¶¶ 32–50, 972 P.2d at 617–21, our supreme court addressed the constitutionality of an analogous statute under Article 2, Section 12, and Article 9, Section 10. At issue in that case was a statute that permitted individual taxpayers to take a state tax credit for contributions made to STOs. A.R.S. § 43–1089.

¶ 35 In dismissing the challenges to Article 2, Section 12, and Article 9, Section 10, our supreme court stated:

> We have already concluded that this tax credit is not an appropriation of public money. Likewise, no tax has been laid here. To the contrary, this measure *reduces* the tax liability of those choosing to donate to STOs. We cannot say that the legislature has somehow imposed a tax by declining to collect potential revenue from its citizens. Nor does this credit amount to the laying of a tax by causing an increase in the tax liability of those not taking advantage of it. Such a construction tortures the plain meaning of the constitutional text. In addition, if we were to conclude that this credit amounts to the laying of a tax, we would be hard pressed to identify the citizens on whom it is assessed. Because we see no constitutional difference between a credit and a deduction, we would also be forced to rule that deductions for charitable contributions to private schools were unconstitutional because they too, would amount to the laying of a tax. This we decline to do.

*Kotterman*, 193 Ariz. at 288, ¶ 50, 972 P.2d at 621.

¶ 36 Section 43–1089 is significantly analogous to the statute at issue in this appeal. Indeed, Appellants concede that this case is "similar in many respects" to the individual income tax credit statute upheld in *Kotterman*. The main thrust of Appellants' argument is that *Kotterman* "[i]s patently incorrect and should be overruled." But we do not, of course, have the authority to overrule or disregard our supreme court. *Bade v. Ariz. Dep't of Transp.*, 150 Ariz. 203, 205, 722 P.2d 371, 373 (App.1986). Because *Kotterman* has addressed and resolved these

particular issues, we will not revisit them.[8]

¶ 37 Appellants, however, argue *Kotterman* does not resolve their contention that § 43–1183 improperly lays a tax in violation of Article 9, Section 10, because the legislature has "definitively resolved" the issue in its purpose statement: "Pursuant to §. 43–223, Arizona Revised Statutes, the legislature enacts § 43–1183, Arizona Revised Statutes, as added by this act, to encourage businesses to direct a portion of *their taxes* by contributing to school tuition organizations in order to improve education by raising tuition scholarships for children in this state." (Emphasis added.)

¶ 38 We are not persuaded that the use of the term "taxes" by our legislature in its purpose statement transforms the effect of the statute into something it is not—the laying of a tax. To hold otherwise would elevate the purpose statement above the level of the actual text of the statute. This is an approach we are obligated to reject. *See Cronin v. Sheldon*, 195 Ariz. 531, 538, ¶¶ 29–30, 991 P.2d 231, 238 (1999) ("To the contrary, the constitutionality of the EPA is not dependent on the preamble because the preamble is not statutory text. . . . The preamble is devoid of operative effect.") (citations omitted); *Foremost Life Ins. Co. v. Trimble*, 119 Ariz. 222, 226, 580 P.2d 360, 364 (App.1978) ("To the extent that there is any conflict between these two sections, we hold that § 20–1602 is clear and unambiguous, and must be considered as controlling over

§ 20–1601, which constitutes the purpose or policy section of Article 10.").

¶ 39 Appellants also argue that the tax credit cap contained in A.R.S. § 43–1183(C) is evidence of our legislature having viewed § 43–1183 as the laying of a tax. The legislature is free to place a limit on the total amount of corporate tax credits that will be granted in any given year or to omit a cap altogether. The fact that the legislature has limited the maximum amount of tax credits per year does not, in our view, signal that the legislature has "somehow imposed a tax by declining to collect potential revenue from its citizens." *Kotterman*, 193 Ariz. at 288, ¶ 50, 972 P.2d at 621. Additionally, Appellants' argument ignores the tax credit cap within A.R.S. § 43–1089, the statutory provision upheld in *Kotterman*. While § 43–1089 does not have a total maximum dollar amount of allowable tax credit as contained in § 43–1183(C), § 43–1089(A) limits the amount individual taxpayers may credit against their taxes. We are confident that the legislature, based upon previous tax returns and projected future filings, has reasonable estimates of the revenue that will not be collected as the result of these tax credits. Therefore, the individual tax credit limitations in § 43–1089 provide an overall limit on the impact of the individual credits that is analogous to the precise limit provided in § 43–1183(C). And our supreme court has affirmed the constitutionality of § 43–1089.

¶ 40 We therefore hold that § 43–1183 does not violate Article 2, Section 12 or Article 9, Section 10 of the Arizona Constitution.[9]

8. Appellants advance a number of arguments against the reasoning of *Kotterman*, including: (1) the history and purpose of Article 2, Section 12 and Article 9, Section 10; (2) that a tax is laid in violation of Article 9, Section 10; (3) Section 43–1183 aids sectarian schools in violation of Article 9, Section 10; and (4) that § 43–1183 involves "public money." *Kotterman* addressed and dismissed all of these arguments. *Kotterman*, 193 Ariz. at 287–92, ¶¶ 53–71, 972 P.2d at 621–25 (rejecting argument based on framers intent and history of Article 2, Section 12 and Article 9, Section 10); *id.* at ¶ 50 ("Likewise, no tax has been laid here. To the contrary, this measure *reduces* the tax liability of those choosing to donate to STOs. We cannot say that the legislature has somehow imposed a tax by declining to collect potential revenue from its citizens."); *id.* at ¶¶ 44–46, 50 (rejecting argument

that § 43–1089 supported or aided a religious establishment); *id.* at ¶¶ 33–43 (explaining the meaning of "public money or property" and concluding that § 43–1089 did not involve "public money").

9. Appellants filed a supplemental citation of legal authority, citing *Cain v. Horne*, 218 Ariz. 301, 183 P.3d 1269 (App.2008) (review granted October 28, 2008), in support of the proposition that § 43–1183 violates Article 9, Section 10 of the Arizona Constitution. Because the statute at issue in *Cain*—a true school voucher program—differs significantly from the statute at issue before this court, the analysis in *Cain* is not applicable here and we need not address its reasoning.

### Arizona Enabling Act

¶ 41 Lastly, Appellants argue that our legislature, by enacting § 43–1183, "violated its fundamental constitutional responsibility toward Arizona's public schools." Appellants premise this argument upon Arizona's Enabling Act. Specifically, Appellants argue that § 43–1183 violates Sections 20 and 26 of the Arizona Enabling Act.

¶ 42 Section 20 states: "That provisions shall be made for the establishment and maintenance of a system of public schools which shall be open to all the children of said State and free from sectarian control; and that said schools shall always be conducted in English." A.R.S. Enab. Act, § 20 (2001). Section 26 provides that schools "provided for in this Act shall forever remain under the exclusive control of the said State, and no part of the proceeds arising from the sale or disposal of any lands granted herein for educational purposes shall be used for the support of any sectarian or denominational school, college, or university." A.R.S. Enab. Act, § 26 (2001).

¶ 43 We reject Appellant's argument. Nothing contained in § 43–1183, nor in its operation, prohibits the "establishment and maintenance of a system of public schools." Nor does § 43–1183 affect whether public schools are open to all children of Arizona. Likewise, § 43–1183 does not commandeer the public school system away from the "exclusive control" of the State of Arizona, nor does it transform the public school system into a system of sectarian control. Section 43–1183 creates a corporate tax credit program that assists parents with additional educational choices for their children. The corporate tax credit dollars have not been earmarked and, indeed, cannot be earmarked until falling into the sovereign purse of the State. *See Kotterman,* 193 Ariz. at 285, ¶ 40, 972 P.2d at 618 ("For us to agree that a tax credit constitutes public money would require a finding that state ownership springs into existence at the point where taxable income is first determined, if not before. The tax on that amount would then instantly become public money. We believe that such a conclusion is both artificial and premature. It is far more reasonable to say

that funds remain in the taxpayer's ownership *at least* until final calculation of the amount actually owed to the government, and upon which the state has a legal claim.") (footnotes omitted). Thus, § 43–1183 does not create a situation where our legislature is siphoning funds from the public school system in order to provide for private, sectarian schools, as the tax credit dollars never enter the general fund.

¶ 44 Appellants argue that because our legislature has created a corporate tax credit program that provides educational scholarships and grants for children to attend non-public schools, and because these scholarships and grants do not cover the entire cost of tuition, only "children whose families can afford to supplement Program scholarship grants with funds to meet the substantial additional costs of sending them to those schools" will be able to attend. Thus, Appellants contend, § 43–1183 expends State resources on a system of schooling that is not open to all of Arizona's children. We reject Appellants' underlying assumption: that § 43–1183 expends State resources. *See* ¶ 35 *supra.* Appellants' argument also overlooks the directive given by the Enabling Act and our Constitution, which is directed toward the legislature's shepherding of the *public* school system. These provisions speak only to maintaining an open and free public school system. They do not touch on tax credit programs that provide for educational opportunities in non-public schools.

### CONCLUSION

¶ 45 Section 43–1183 does not violate the Establishment Clause of the United States Constitution. Section 43–1183 has a valid, secular purpose; it does not have the effect of either advancing or inhibiting religion, because it is neutral towards religion and provides for genuine private choice; and § 43–1183 does not involve excessive governmental entanglement. Based upon our supreme court's analysis and holding in *Kotterman,* § 43–1183 is not violative of Article 2, Section 12, nor Article 9, Section 10. The Arizona Enabling Act does not prohibit the program instituted by § 43–1183.

¶ 46 We therefore affirm the judgment of the trial court dismissing Appellants' complaint for failure to state a claim upon which relief may be granted.[10]

CONCURRING: PATRICIA K. NORRIS, Presiding Judge.

KESSLER, Judge, dissenting in part and concurring in part.

¶ 47 I concur with the majority on two points and disagree with it on two others. First, I agree with the majority that *Kotterman v. Killian*, 193 Ariz. 273, 972 P.2d 606 (1999), controls the issues Appellants raise under Article 2, Section 12 and Article 9, Section 10 of the Arizona Constitution and that the use of the term "taxes" in the purpose statement to A.R.S. § 43–1183 does not change that result. Appellants have preserved their arguments on those issues and they are best made to the Arizona Supreme Court. Second, I concur with the majority's conclusion that § 43–1183 by itself does not commandeer our public school system or subject that system to sectarian control in violation of Sections 20 and 26 of the Arizona Enabling Act.

¶ 48 I dissent from the majority's conclusion that § 43–1183 does not violate the Establishment Clause of the First Amendment to the United States Constitution under *Zelman v. Simmons–Harris*, 536 U.S. 639, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002). Dismissal of the complaint was not appropriate because on this record the tax credit program is unconstitutional under the First Amendment both as to secular purpose and neutrality towards religion. Since there are genuine disputes of fact whether a tax credit program giving aid solely to private charitable and educational institutions which directly discriminate against children based on their religion is predominately serving a secular purpose or is neutral with respect to religion, the judgment should be reversed. However, while I conclude that the tax credit scheme meets one element of Establishment Clause analysis, whether it qualifies as a program of true private choice, I do so based on the universe of choices available to parents as mandated by *Zelman*.

## I. Procedural Status of the Case and Standard of Review

¶ 49 The majority's analysis appears in a factual vacuum because neither the superior court nor the majority properly address the procedural status of this case, the factual record, and how those affect our standard of review. The superior court did not address the factual record because it dismissed the complaint on the assumption that *Kotterman* controlled this case except for the issue of whether the tax scheme violated the State's obligation to maintain a general and uniform non-sectarian public school system.[11] The superior court's assumption was erroneous because, as the majority acknowledges, *Zelman* controls our Establishment Clause analysis. We are bound by United States Supreme Court decisions on federal constitutional issues when the Court issues a decision that differs from a prior Arizona Supreme Court decision on the same subject. *Hernandez–Gomez v. Volkswagen of Am., Inc.*, 201 Ariz. 141, 143–44, ¶ 8, 32 P.3d 424, 426–27 (App.2001); *State v. Superior Court*, 2 Ariz.App. 458, 460, 409 P.2d 742, 744 (1966). *See also Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) (if precedent of Court directly applies but appears to rest on reasons rejected in other lines of cases, court of appeals must follow case which directly controls). *Zelman*, decided in 2002, is a United State Supreme Court case regarding indirect government aid to religious schools under the Establishment Clause. *Kotterman*, decided in 1999, is an Arizona case regarding the same subject. Thus, because the two cases concern the same subject and *Zelman* was decided after *Kotterman*, *Zelman* is the controlling precedent on the Establishment Clause issue.

---

10. Our dissenting colleague agrees with us on all points except the Establishment Clause issue. We respectfully disagree with his Establishment Clause analysis.

11. As to the general and uniform clause of the Arizona Constitution, the superior court relied on Arizona Supreme Court decisions other than *Kotterman*.

¶ 50 While recognizing that *Zelman* controls the Establishment Clause issue, the majority proceeds with an analysis of *Zelman* with only a limited discussion of the factual record presented in documents attached to the motions papers. That status and record affect our review. In opposition to the motion to dismiss, the Appellants attached various documents to their memoranda, supporting allegations in the complaint. Those attachments included documents that were attached to briefs filed in a related case in the United States Court of Appeals for the Ninth Circuit, including Department of Revenue reports analyzing School Tuition Organizations ("STOs") and scholarships offered as well as the amounts of tax credits the STOs controlled. When papers are attached to a response to a motion to dismiss and the superior court considers those documents or does not strike them, the motion to dismiss is treated as a motion for summary judgment. Ariz. R. Civ. P. 12(b); *Vasquez v. State*, 220 Ariz. 304, 308, ¶ 8, 206 P.3d 753, 757 (App.2008) ("Because the court considered 'matters outside the pleading,' it should have treated the motion [to dismiss] as one for summary judgment.") (citation omitted); *see Jacobson v. AEG Capital Corp.*, 50 F.3d 1493, 1496 (9th Cir.1995) ("If matters outside the pleadings are submitted, the motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is treated as one for summary judgment under Federal Rule of Civil Procedure 56.").

¶ 51 Summary judgment may be granted when "there is no genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law." Ariz. R. Civ. P. 56(c). In reviewing a motion for summary judgment, we determine *de novo* whether any genuine issue of material fact exists and whether the trial court prop-

erly applied the law. *Eller Media Co. v. City of Tucson*, 198 Ariz. 127, 130, ¶ 4, 7 P.3d 136, 139 (App.2000) (citation omitted). We review the decision on the record made in the superior court. *Phoenix Baptist Hosp. & Med. Ctr., Inc. v. Aiken*, 179 Ariz. 289, 292, 877 P.2d 1345, 1348 (App.1994) (citation omitted). We view the facts and the inferences to be drawn from those facts in the light most favorable to the party against whom judgment was entered. *Prince v. City of Apache Junction*, 185 Ariz. 43, 45, 912 P.2d 47, 49 (App.1996) (citation omitted). We also consider legal questions *de novo*. *Inch v. McPherson*, 176 Ariz. 132, 136, 859 P.2d 755, 759 (App.1993) (citation omitted). Accordingly, before addressing the law, we must summarize the factual record under the appropriate standards.

## II. Factual Background[12]

¶ 52 In their amended complaint, Appellants alleged that pursuant to § 43–1183, through 2011 all corporations that pay Arizona state income tax can receive a tax credit against such taxes for cash contributions made to STOs, if the contributions were approved by the Arizona Department of Revenue ("DOR").[13] According to the complaint, those contributions would diminish the State's general fund revenue and forty-six percent of that fund is expended annually to finance Arizona's public school system. While DOR's discretion to approve the contributions is limited only by the aggregate cap annually imposed on tax credits under the statute,[14] there is no cap on any individual corporate contribution. The contribution can exceed the taxes owed by the corporation to the state that tax year and carry forward the excess credit to offset taxes for up to five consecutive years. A.R.S. § 43–1183(F). In

---

12. To the extent that a factual reference in the amended complaint is supported by the language of § 43–1183, I reference the statutory provision in my dissent. To the extent the statute does not support the allegation, I rely solely on the statutory provision.

13. The STOs must be charitable organizations exempt from federal taxation under 501(c)(3) of the United States Internal Revenue Code.

14. According to a DOR document revising implementation of the scheme ("Revised Implementa-

tion"), the DOR will disapprove a proposed contribution to an STO only if it would exceed the aggregate statutory cap for annual tax credits under the scheme. Appellants have not moved to strike the Revised Implementation. Accordingly, we will take judicial notice of that fact. *Jarvis v. State Land Dep't*, 104 Ariz. 527, 530, 456 P.2d 385, 388 (1969) (citation omitted), *modified by*, 106 Ariz. 506, 479 P.2d 169 (1970) *and by* 113 Ariz. 230, 550 P.2d 227 (1976).

contrast, the scheme caps the aggregate amount of tax credits per fiscal year to $10 million for fiscal year 2006–07 with the cap to increase by twenty percent each and every future year over the prior year. According to the DOR, the aggregate cap is $12 million for fiscal year 2008, $14.4 million for fiscal year 2009, $17.28 million for fiscal year 2010 and $20.736 million for fiscal year 2011. Pursuant to A.R.S. § 43–1183(C)(3), DOR must approve all proposed contributions on a first-come, first-serve basis, provided the contributions do not exceed the aggregate maximum contribution for the fiscal year.

¶ 53 The tax credit money can be used only for nonpublic schools. Any STO must use at least ninety percent of its annual revenue to award scholarship tuition grants to students attending non-public elementary or secondary schools in Arizona. An STO may award scholarships only to children whose family incomes do not exceed one hundred eighty-five percent of the income limit used to qualify a child for school lunches under the National School Lunch and Child Nutrition Acts, approximately $70,000 per year for a family of four. A.R.S. § 43–1183(J). No similar tax credit is offered for students attending public schools to offset fees or expenses at those schools.

¶ 54 The statutory scheme does not limit either the STOs or the recipient private schools from discriminating on the basis of religion on who will receive tuition scholarships from the tax credits. Indeed, the complaint alleges both the STOs and the recipient schools do and will discriminate on the basis of religion. Thus, except for attending a qualified private school and family income, no standards are set in the statute for determining who will receive scholarship funds. The statute does not prohibit STOs from

discriminating on the basis of race, sex, religion or any other basis.[15]    A.R.S. § 43–1183(Q)(2). The statute permits schools receiving the scholarship money to discriminate on the basis of religion and sex, but not race, color, handicap, familial status or national origin. A.R.S. § 43–1183(Q)(1)(a).

¶ 55 The Appellants analogize to the similar individual tax credit scheme which was the subject of *Kotterman* to allege the effect of the corporate tax credit scheme. They do so because they allege the same STOs eligible under the individual credit scheme are the STOs for the corporate scheme. Accordingly, there are approximately fifty-four STOs eligible for the funds under the scheme, twenty-four of which are religious organizations or are affiliated with religious organizations. Those religiously-based STOs annually distribute more than seventy percent of all the tax credited funds under the similar individual tax credit scheme. In 2005, $42 million was contributed to STOs under the individual tax credit scheme of which more than $30 million was contributed to religiously affiliated STOs.[16] All or almost all scholarships awarded by religiously affiliated STOs under the individual tax credit act allegedly are awarded on a religiously discriminatory basis and on the express condition that the recipient attend a religious school for a particular religious denomination. Appellants allege that will be the same under the corporate tax credit scheme. Like the STOs, religious schools receiving these funds are free to discriminate against students on the basis of religion and sex and allegedly do discriminate by limiting acceptance to students based on their religious beliefs while requiring students to attend and participate in religious ceremonies and observances. *See* A.R.S. § 43–1183(Q)(1)(a).

15. However, since the statute requires STOs to be qualified under § 501(c)(3) of the Internal Revenue Code, STOs risk their tax exempt status under that code if they discriminate based on race, but they may still discriminate on the basis of religion if they are affiliated with a religious denomination.

16. Appellants allege that of those tax credits, in 2005 almost $22 million was donated to three STOs, two of them associated with the Catholic Church and one with a Christian academy. These allegations are supported by documents

filed with the superior court in response to the motions to dismiss. According to those documents from the DOR, in fiscal year 2006, approximately $51 million in donations were made to 56 STOs and over $40 million in scholarship funds were distributed. Slightly over $28 million in donations were made to four STOs, three of which were connected with Catholic or Christian denominations. Those documents do not show, however, which STOs gave scholarship funds for students attending particular schools.

Aside from the scholarship cap, the only limitation on STOs is that they must not limit scholarships to just one school. A.R.S. § 43–1183(Q)(2)(b).

¶ 56 While the record reflects fifty-six STOs currently receiving donations and making scholarships to attend approximately 357 schools, that may be very different under the corporate tax scheme. This is because unlike the individual scheme, § 43–1183 has an aggregate annual limit of tax credits. Thus, it is possible under the corporate scheme to have several corporations use the entire aggregate tax credit in any year (with carryovers to future years) to fund scholarships to one STO, which will only fund schools of one religious denomination; and those schools will not accept students unless they are of that denomination and/or agree to participate in the religious observances of that denomination.

## III. Analysis

¶ 57 The current test for school vouchers (or in this case tax credits) for Establishment Clause purposes is found in *Zelman*. The Court in *Zelman* held that in cases involving indirect governmental aid to religious schools, four criteria must be met to comport with the Establishment Clause. First, the aid program's predominate purpose must be secular and not to advance or inhibit religion. 536 U.S. at 648–49, 122 S.Ct. 2460. In addition, to ensure that the program's effect does not advance or inhibit religion, the indirect aid program must: (1) be "[e]ntirely neutral with respect to religion," (2) provide "benefits directly to a wide spectrum of individuals," defined without reference to religion, and (3) permit "such individuals to exercise genuine choice among options public and private, secular and religious." *Zelman*, 536 U.S. at 662, 122 S.Ct. 2460; Ira C. Lupu & Robert W. Tuttle, *Zelman's Future: Vouchers, Sectarian Providers, and the Next Round of Constitutional Battles*, 78 Notre Dame L.Rev. 917, 928–29 (2003) ("Lupu"). If any one of these criteria is not met, "the program should be struck down under the Establishment Clause." *Zelman*, 536 U.S. at 669, 122 S.Ct. 2460 (O'Connor, J., concurring).

¶ 58 Applying these three effects criteria, *Zelman* considered other relevant factors. Specifically, the Court found persuasive that the Cleveland voucher program at issue: (1) was part of a multifaceted attempt by the State to improve educational opportunities, (2) allowed all schools within the district to participate, (3) only gave preference to low-income families, allowing no other preferences, and (4) did not provide financial incentives to skew the program toward religious schools. *Zelman*, 536 U.S. at 653, 122 S.Ct. 2460. The Court reached its holding based on the aggregate of these factors. It held that by looking at the Cleveland program as a whole, the voucher system was one of true private choice and it did not have the effect of advancing religion.

¶ 59 In reaching its conclusion, the Court in *Zelman* also distinguished *Committee for Public Education & Religious Liberty v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2993, 37 L.Ed.2d 948 (1973). In *Nyquist*, the Court held in part that providing tuition reimbursement and tax benefits to parents of children attending nonpublic schools was unconstitutional under the Establishment Clause because its effect was to advance religion. *Id.* at 780–94, 93 S.Ct. 2993. The Court in *Zelman* held that the Cleveland voucher system was unlike the tax exemption and tuition reimbursement system in *Nyquist* for two general reasons. First, in *Nyquist*, the function was unmistakably to provide financial support for sectarian institutions, the tax benefits were unrelated to the amount of any money actually expended by any parent, the tuition reimbursement was designed explicitly to offer an incentive to parents to send their children to sectarian schools, and the program flatly prohibited the participation of any public school or parent of any public school enrollee. *Zelman*, 536 U.S. at 661, 122 S.Ct. 2460. Second, the Court noted that in *Nyquist* it had reserved judgment as to cases involving "some form of public assistance . . . made available generally without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefitted," which was the question presented in *Zelman*. *Id.* (quoting *Nyquist*, 413 U.S. at 782–83 n. 38, 93 S.Ct. 2955).

¶ 60 Here, the majority applies the same analytical strategy as *Zelman* and reaches the same conclusion. To reach its holding, the majority looks at the Arizona corporate tax scheme as a whole by addressing each of the above items. It then concludes that the corporate tax credit program does not have the stated purpose or the effect of advancing religion and is a program of true private choice. *Supra* ¶¶ 13–28. The majority's analysis, however, overlooks several aspects of the Arizona program that unconstitutionally have the effect of advancing religion and that negate genuine choice. To understand that, one must compare the program in *Zelman* and the tax scheme in Arizona.

¶ 61 In *Zelman,* Ohio enacted a school voucher program because Cleveland schools had failed to such an extent that a federal court order required that the state superintendent take over the district's management and operation. *Zelman,* 536 U.S. at 644–45, 122 S.Ct. 2460. The government provided tuition vouchers directly to parents based on financial need, giving preference to families with incomes two hundred percent below the poverty line. *Id.* at 646, 122 S.Ct. 2460. Those parents could use the vouchers for private schools in Cleveland or for public schools in adjacent districts. *Id.* at 645, 122 S.Ct. 2460. If parents chose to keep their child in a Cleveland public school, they could use voucher money to hire a private tutor for their child. *Id.* at 646, 122 S.Ct. 2460. The participating private schools were precluded from discriminating on the basis of religion. *Id.* The state superintendent determined the number of vouchers available on an annual basis. *Id.* at 646, n. 2, 122 S.Ct. 2460.

¶ 62 The Arizona tax credit program is different from Cleveland's voucher program in a number of ways. As alleged by the Appellants, Arizona gives tax credit money to STOs which then distribute that money in the form of scholarships to qualifying students to use only in private schools which the STOs have pre-selected. Religious STOs control and distribute approximately seventy percent of the tax credit scholarships. Those STOs can require students to attend a religious school of a particular denomination as a condition of their scholarship award. In addition, religious STOs can refuse to grant scholarships to students who do not subscribe to the same denomination as that of the STO. The schools receiving STO scholarship students can and allegedly do discriminate on the basis of religion and may require students to participate in religious observances as a condition of their scholarship. Finally, the corporate tax credit program does not directly limit the amount that corporations can donate, but it does impose a limit of $10 million in the aggregate amount donated by all corporations and credits are only available on a first-come, first-served basis.

¶ 63 For the reasons stated below, I conclude that the record raises questions as to the tax program's secular purpose, that Arizona tax scheme is not neutral with respect to religion and does not provide benefits directly to a wide spectrum of individuals defined without reference to religion. Either of these factors is sufficient to reverse and remand this matter to the superior court. While I conclude that the tax program meets the third prong of the effects test in *Zelman,* I reach that conclusion in a different manner than the majority.[17]

*A. Secular Intent*

¶ 64 As *Zelman* points out, the first test for Establishment Clause analysis is whether the purpose of the program is secular in nature or the government acted with the purpose of advancing or inhibiting religion. *Id.* at 648–49, 122 S.Ct. 2460. In *Zelman,* the Court dispatched that issue in a single sentence noting there was "no dispute that the [voucher] program challenged [in *Zelman]* was enacted for the valid secular purpose of providing educational assistance to

---

**17.** The majority posits that *Zelman* upheld the Cleveland voucher program based on a number of inter-related factors and that the bar to private discrimination in the Cleveland voucher program was not dispositive. *Supra* n. 6. Since the Ohio program did not permit private discrimination by schools, it is impossible to tell what the Court would have done with a situation such as this, in which vast percentages of the tax credit funds are allegedly controlled by a few STOs which allegedly discriminate on the basis of religion and in fact limit true parental choice. Failure to meet any of the Establishment Clause factors would invalidate a program.

poor children in a demonstrably failing public school system." *Id.* at 649, 122 S.Ct. 2460.

¶ 65 The majority takes the same tact here, concluding that the stated purpose of the tax credit scheme is to encourage businesses to direct a portion of their taxes to provide scholarships " 'in order to improve education.' " *Supra* ¶ 13. As the majority explains, by providing such scholarships through tax credits, competition in education is increased and competition is bound to improve the quality of both private and public schools. *Supra* ¶¶ 16–18.

¶ 66 I agree with the majority that a system with both private and public schools, under certain circumstances, may foster competition resulting in improving education for most students. However, in conducting Establishment Clause analysis to determine purpose, while we give deference to the stated purpose out of a matter of judicial restraint, we are required to determine that the stated purpose must be sincere, legitimate and not a sham. *Bowen v. Kendrick,* 487 U.S. 589, 602–04, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988); *Edwards v. Aguillard,* 482 U.S. 578, 586–87, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987). Rather, as the United States Supreme Court most recently explained, we approach the intent test in Establishment Clause cases differently than we do in reviewing economic legislation. *McCreary County v. ACLU of Ky.,* 545 U.S. 844, 865 n. 13, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005). Unlike the deference given to stated purposes in review of economic legislation, we review stated purposes in Establishment Clause cases to ensure the alleged secular purpose is genuine and is not secondary to a religious objective. *Id.* at 846, 125 S.Ct. 2722. The secular purpose test is not meant to be a "pushover" for any claim of secular objectives. *Id.* at 864, 125 S.Ct. 2722. As the Court has advised us, we must not be blind to predominating religious purpose.

*Edwards,* 482 U.S. at 590, 107 S.Ct. 2573 (citing to *Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968)).

¶ 67 There is evidence that the State is not seeking to increase competition between the public and private school sector, but actually diverting funds from the public to the private sector and decreasing spending for public schools. This would inhibit the ability of the public schools to truly compete and improve the services they provide.

¶ 68 The public schools rely on government funding for their sole or main source of general revenue and the State now offers a supplementary source of revenue for the private schools through tax credits. The State completed a cost analysis on the individual cost savings to the State's general fund when tax credit moneys were spent for private school scholarships. Those documents reflect that the State will expend *less* general fund money for the public schools than the funds diverted through the tax credits. Vicki Murray, Fiscal Analysis of Arizona's Corporate Tax Credit Scholarship Program at 1 (Oct.2006). That study is consistent with Arizona legislative studies stating that the loss of tax revenue, at least from the individual tax credit scheme for private school scholarships, would be offset by savings in having to teach fewer students in public schools.[18] This reduction was not ignored by the Legislature when it considered the similar individual tax credit program for private school scholarship contributions.[19]

¶ 69 In sum, this implies that the State's intent is not to continue to spend the same amounts of general fund moneys on fewer public school students, but to divert tax revenues from the general fund money to private schools. The public schools are thus provided with fewer resources as the State decreases public school funding in light of the diversion of such funds to private school

---

**18.** Income Tax Credit Review: Joint Legis. Income Tax Credit Review Comm. at 18 (Dec. 7, 2006) *available at* http:/www.azleg.gov/jlbc/jlitcrcppt170706 (last visited Jan. 23, 2009); Joint Legis. Budget Comm. Staff Memorandum at 9, 11 (Nov. 30, 2006) *available at* http:/www.azleg.gov/jlbc/jlitcrcppt170706 (last visited Jan. 23, 2009). Those savings are substantial. As indicated in the latter report, as of November

2006, the Joint Legislative Budget Committee estimated the tax revenues diverted to private schools exceeded $42 million annually.

**19.** *See* Minutes: H.B.2074, S. Comm. on Educ. at 10 (March 24, 1997); Minutes: H.B.2074, H. Comm. on Educ. at 4 (Jan. 29, 1997).

scholarships. True competition arises when two independent entities compete for market share, not when the primary source of funding for one of the competitors diverts such funds to the other competitor. This lack of competitiveness is underscored by the fact that Arizona is currently near the bottom of all states in public school spending per student and the legislature is proposing massive decreases in public education spending due to the current fiscal crisis.[20]

¶ 70 The fact that the State may be seeking to divert funds from public schools to private schools, however, is insufficient for Establishment Clause analysis unless the predominate purpose is to advance religion. *Zelman*, 536 U.S. at 648–49, 122 S.Ct. 2460; *Edwards*, 482 U.S. at 599, 107 S.Ct. 2573 (Powell, J., concurring). *Cf. McCreary County*, 545 U.S. at 864, 125 S.Ct. 2722 (court must make sure secular purpose is not secondary to religious purpose). Here, there is evidence in the record and in the complaint that the State was aware that over seventy percent of the scholarship aid under the individual tax credit scheme was being used for sectarian private schools, many of which allegedly discriminated on the basis of religion in admitting students.

¶ 71 The majority attempts to limit the effect of this factual background by noting the Court in two Establishment Clause cases was not concerned with the statistics of the percentage of students who went to secular schools because that percentage was a result of private parental choice. *Supra* ¶ 25. The distinguishing fact here, however, is that these percentages show that a vast majority of the tax credit money is controlled by STOs, which allegedly discriminate on the basis of religion; thus precluding or at least inhibiting parents from sending their children to schools of their choice. Given that the same STOs were allegedly implementing both tax credit schemes and that the same results would incur under the corporate tax credit, there is at least a question of fact whether the real purpose of the programs was to advance religious education.[21]

¶ 72 I cannot determine from this record that the predominate purpose of the tax scheme is religious. *Edwards*, 482 U.S. at 599, 107 S.Ct. 2573 (Powell, J., concurring). This, however, is not from the failing of the parties, but rather from the fact the superior court assumed that this case was controlled by *Kotterman* when it was controlled by *Zelman*. I would, therefore, reverse and remand on this issue to allow the lower court to conduct the necessary inquiry on whether the predominate purpose violates the Establishment Clause. Accordingly, this matter should be remanded to the superior court to explore.

### B. Neutrality and Benefits Awarded Without Reference to Religion

¶ 73 The majority concludes that the Arizona corporate tax credit program is neutral with respect to religion because the statute does not distinguish between sectarian and non-sectarian schools, and the credit is available to corporations without respect toward religion. According to the majority, those two factors combined with what it describes as layers of choice, result in a neutral program. *Supra* ¶¶ 24–25.

20. Arizona has one of the lowest levels of public school spending per student in the United States. Other sources indicate that Arizona is failing in its mission to educate its youth in public schools. *Quality Counts 2009: Portrait of a Population*, Education Week Jan. 9, 2009. Given the current fiscal crisis, the State recently proposed cutting over $1 billion from the education budget for fiscal years 2009 and 2010. FY 2009 and FY 2010 *Budget Options*: Appropriations Comm. 24 (Jan. 15, 2009) *available at* http:/azleg.gov/jlbc.htm (report made by Comm. Chairman) (last visited Jan. 23, 2009).

21. In *Kotterman*, the Arizona Supreme Court applied a more deferential test to determine the secular purpose of the individual tax credit program. 193 Ariz. at 278–79, ¶¶ 6–8, 972 P.2d at 611–12. We are not bound by that holding because it preceded *McCreary County*, which explained that we are not to apply the very deferential test for economic legislation in this context. 545 U.S. at 865 n. 13, 125 S.Ct. 2722. Additionally, when it decided *Kotterman*, the court did not have the additional facts related to the legislature's knowledge of the extent of diversion of funds under the two tax credit programs, which are available to us now, nor the current fiscal crisis with resulting proposed reduction of state funding to public education.

¶ 74 I disagree. In light of the differences between the Cleveland voucher program and Arizona's tax program noted above, the Arizona program is unconstitutional under the Establishment Clause because it is not neutral with respect to religion and the aid is not provided without reference to religion—the first two prongs of the *Zelman* effect analysis. Indeed, the program is not neutral toward the ultimate beneficiaries, parents and students, even though those are precisely the beneficiaries that *Zelman* and its progeny seek to protect. Based on these differences, the tax credit program here is more like the tax relief struck down in *Nyquist* than the voucher program upheld in *Zelman.*

¶ 75 *Zelman* states that where a government aid program benefits a broad class of people and is neutral with respect toward religion, it is likely to be constitutional. 536 U.S. at 652, 122 S.Ct. 2460. While these first two requirements of the effects test overlap, they serve slightly different purposes. The first requirement, that the program must be "neutral in all respects toward religion[,]" 536 U.S. at 652, 122 S.Ct. 2460, means that there must be formal neutrality: "the classes of both the participating schools and the eligible students must be defined in non-religious terms." Lupu, 78 Notre Dame L.Rev. at 928. The second effects factor looks at how the program is effectuated: it must provide aid "[d]irectly to a broad class of individuals defined without reference to religion." *Zelman,* 536 U.S. at 653, 122 S.Ct. 2460. As explained by one commentator, this test:

> [E]nsures that the formal neutrality required by the first criterion does not in fact represent a gerrymander in favor of a particular religious group; the more dispersed the benefits, the less likely any one religious group would be considered the intended beneficiary of government largesse.

*Lupu,* 78 Notre Dame L.Rev. at 928.

¶ 76 Thus, the first two criterion of the effects test mean that the program distributes aid to parents and students without reference to religion. *Zelman,* 536 U.S. at 651, 669, 122 S.Ct. 2460 (a program distributes aid in a neutral fashion when there is no

"[d]ifferentiation based on the religious status of beneficiaries....") (O'Connor, J., concurring). The Supreme Court has repeatedly emphasized this point.

¶ 77 In *Mitchell v. Helms,* 530 U.S. 793, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000), the federal government gave money directly to state agencies—local educational agencies ("LEAs") and state educational agencies ("SEAs")—which then distributed money to schools. *Id.* at 801–02, 120 S.Ct. 2530. The federal government required that the LEAs and SEAs distribute funds to both public and private schools, including religious schools, based on enrollment numbers. *Id.* at 802, 120 S.Ct. 2530. The Court upheld the program because aid was "[a]llocated on the basis of neutral, secular criteria ... and [was] made available to both religious and secular beneficiaries on a nondiscriminatory basis." *Id.* at 795, 120 S.Ct. 2530. Although the programs in *Mitchell* and the present case are different in some ways, in both cases there is an intermediary organization which distributes funds. The LEAs and SEAs are similar to the STOs in that they channel government money for educational purposes to beneficiaries. In *Mitchell,* funds were distributed regardless of whether the school beneficiary was public, private, or religious, only that it met certain enrollment requirements. Here, some funds are distributed only if the parent or student subscribes to a particular religious sect.

¶ 78 Similarly to *Mitchell,* in *Zobrest v. Catalina Foothills Sch. Dist.,* 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993), government benefits were distributed "neutrally to any child qualifying as disabled." *Id.* at 10, 113 S.Ct. 2462. In *Witters v. Wash. Dep't of Serv. for the Blind,* 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986), government benefits were given to any visually handicapped student seeking vocational assistance. *Id.* at 483, 106 S.Ct. 748. In *Mueller v. Allen,* 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983), government benefits were given to any parent who paid for school-related expenses. *Id.* at 390, 103 S.Ct. 3062. Finally, in *Zelman,* government benefits were distributed to any parent qualifying as low-income. 536 U.S. at 646, 122 S.Ct. 2460. These cases

show that a government aid program is neutral if parents receive aid without first being asked if they subscribe to a certain religious sect or belief. In essence, the questions posed above before individuals received government benefits were: (1) Is your child disabled?, (2) Are you blind or visually handicapped?, (3) Do you pay for school-related expenses?, or (4) Are you poor? If the answer was "yes" to any of these questions, then government aid was distributed. Nowhere in these cases is the threshold question for receipt of government benefits: Are you Catholic, Jewish, Lutheran, Baptist, Mormon or Muslim.

¶ 79 By stark contrast, the Arizona corporate tax credit program authorizes STOs and qualified schools to first ask parents and students what religious sect they belong to before benefits are distributed. STOs are permitted to and allegedly do refuse to give a parent scholarship money if they do not subscribe to a certain religious belief. This is not neutral with respect to religion and does not disseminate the benefit without regard to religion.

¶ 80 The majority downplays this fact by stating that it is the STOs which discriminate, not the State of Arizona.[22] *Supra* ¶ 27. However, while that might work in some instances for the private choice criteria, *see infra* III(C), that is insufficient for the first two criteria of the effects test. The State cannot do by indirection what it cannot do directly. *Norwood v. Harrison*, 413 U.S. 455, 462–65, 470, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973); *Airport Prop. v. Maricopa County*, 195 Ariz. 89, 98, 985 P.2d 574, 583 (quoting *State v. Yuma Irrigation Dist.*, 55 Ariz. 178, 184, 99 P.2d 704, 706 (1940)). The sole

purpose of STOs is to distribute tax credit money, the government permits the creation of STOs, and the government funnels funds directly to the STOs. *E.g.* http://www.acsto.org/ ("The Arizona Christian School Tuition Organization, Inc. (ACSTO) was incorporated in 1998 for the sole purpose of implementing the private school tuition tax credit law."). If the State performed the same functions as the STOs, it would be unconstitutional. For example, if the State directed seventy percent of the tax credit funds to religious schools and if those schools only admitted students of one religion, then its effect would be the unconstitutional government advancement of religion. However, Arizona permits STOs to do just that. Thus, the government permits STOs by proxy to do indirectly what it is precluded from doing directly. STOs, as an integral part of the government program, convey a message of exclusion based on religious beliefs, and have the imprimatur of governmental approval. *See Zobrest*, 509 U.S. at 23, 113 S.Ct. 2462 (Blackmun, J., dissenting). This violates the Establishment Clause because it has the effect of advancing or inhibiting religion.

¶ 81 Nor, as argued by the majority, does the fact that private entities are permitted to discriminate mean that such discrimination is the result of parental choice in choosing the STOs to which they apply for funds. *Supra* ¶ 27. When such funds are limited and controlled by a small number of STOs that discriminate on the basis of religion, it is not the parental choice which furthers the discrimination, but the State by permitting the STOs to control the funds and discriminate by awarding funds on the basis of religion.[23]

**22.** The majority also argues that the individual school tax credit program has the same features as the corporate tax credit program and was upheld in *Kotterman*. *Supra* ¶ 27. However, it is the later *Zelman* analysis which controls here. *Supra* ¶ 49.

**23.** The majority points to no case on which *Zelman* relied for its conclusions that permitted schools or other indirect beneficiaries of state largess to discriminate on the basis of religious belief. The only such case on which *Zelman* relied as a direct predecessor in which schools might discriminate on the basis of religion is *Mueller*. In *Mueller*, the Court upheld tax deductions for educational expenses of parents who

chose to send their children to public or private, secular or nonsecular, schools even though apparently the nonsecular schools could discriminate in admission of students on the basis of religious belief without violating state law. 463 U.S. at 390 and n. 1, 103 S.Ct. 3062. The Court did not address that factor in *Mueller*. As *Mueller* explained, however, the tax program upheld there applied to all students, public and private, not to just private school students, thus distinguishing *Mueller* from *Nyquist*. *Id.* at 397–98, 103 S.Ct. 3062. Moreover, *Mueller* also pointed out that there the tax deductions were granted directly to parents who chose the schools their children attended. *Id.* at 399–400, 103 S.Ct.

¶ 82 Finally, it is the lack of any tax benefit to parents sending their children to public schools which further distinguishes this case from *Zelman* and makes it more comparable to *Nyquist*. In *Nyquist*, the Court struck down under the Establishment Clause direct aid for repair and maintenance of private schools (413 U.S. at 774–80, 93 S.Ct. 2993), tuition reimbursements (413 U.S. at 780–89, 93 S.Ct. 2993) and tax credits (413 U.S. at 789–94, 93 S.Ct. 2993) for parents who sent their children to private, mainly sectarian schools. In *Zelman*, the Court upheld the voucher program when it was used to allow parents to choose to send their children to private schools, to send their children to nonfailing public schools or to hire tutors for their children if they continued to attend Cleveland's failing public schools. *Zelman,* 536 U.S. at 644–46, 122 S.Ct. 2460. The Court in *Zelman* explained that what distinguished *Zelman* from *Nyquist* was a number of factors, primarily that the benefits in *Nyquist* were "exclusively to private schools and the parents of private school enrollees ... [whose] 'function' was *'unmistakably* to provide desired financial support for nonpublic, sectarian institutions' " and "flatly prohibited the participation of any public school, or parent of any public school enrollee." 536 U.S. at 661, 122 S.Ct. 2460 (quoting *Nyquist,* 413 U.S. at 783, 786, 93 S.Ct. 2955). The voucher program, the Court in *Zelman* held, shared none of these features. *Id.*[24] Additionally, the Court in *Zelman* emphasized that *Nyquist* did not control the Cleveland voucher program because *Nyquist* was expressly limited to programs in which parents sent their children to private schools. *Id. Nyquist* reserved judgment for cases involving aid to persons sending their children to both public and private school, the question presented in

*Zelman. Id.* (quoting *Nyquist,* 413 U.S. at 782–83 n. 38, 93 S.Ct. 2993).

¶ 83 The tax program here is closer to that of *Nyquist* than *Zelman.* The benefits are not available to any parent, but only to parents who want to send their children to private schools. Parents who desire to send their children to public schools are deprived of any assistance to meet school expenses not paid for by public schools. Moreover, some, if not many, parents who desire to send their children to private schools may and will be excluded from assistance because allegedly the vast majority of corporate-funded scholarships will only be available to persons holding the same religious beliefs as the STOs or schools participating in the program. Since the tax credit program is not equally available to parents with children attending public as well as private schools, in contrast to *Zelman's* voucher program, it violates the Establishment Clause under *Nyquist* and is not protected by *Zelman.* While, unlike *Nyquist,* the private schools may not yet be failing, the benefits here are "exclusively to ... the parents of private school enrollees ... [so the program's] 'function' [is] '[t]o provide desired financial support for nonpublic, sectarian institutions.' " *Zelman,* 536 U.S. at 661, 122 S.Ct. 2460 (quoting *Nyquist,* 413 U.S. at 783, 786, 93 S.Ct. 2955).[25]

### C. Private Choice

¶ 84 The majority also holds that the Arizona program is one of true private choice because there are two layers of individual choices involved in which schools receive government aid. *Supra* ¶¶ 21–22. Specifically, the majority relies on the corporate taxpayer's choice to contribute its credits to STOs and the parent's choice of where to use the

3062. Here, the discrimination occurs not by the parents seeking the scholarships, but by the STOs which limit the choices of parents, the presumed ultimate beneficiaries of the funds, based solely on their religious beliefs.

**24.** Included in those features were that the tax benefits were unrelated to any amount of money actually expended by any parent on tuition and that tuition reimbursements offered an incentive to send children to sectarian schools. *Zelman,* 536 U.S. at 661, 122 S.Ct. 2460.

**25.** Interestingly, the Court in *Nyquist* found that despite the program's effects, its purpose was still secular because it allegedly sought to increase school choice and avoid overburdening public schools with students who would otherwise go to private schools. 413 U.S. at 763–67, 773–74, 783, 791, 93 S.Ct. 2993. While the alleged purpose here is secular, although subject to some doubt, *supra* III(A), the effect is to encourage parents to send their children to private schools by providing scholarships, mainly to sectarian schools.

scholarship money. While I agree that the program meets the third prong of the *Zelman* test, private choice, it does so not because of these separate layers, but rather because it must be viewed in the context of all other choices available to parents and children.

¶ 85 *Zelman* requires that courts determine true private choice by evaluating the universe of school options available to parents in the State and then, based on those options, courts must determine whether parents are being coerced into choosing religious schools.[26] 536 U.S.' at 655–56, 122 S.Ct. 2460 ("The Establishment Clause question is whether Ohio is coercing parents into sending their children to religious schools, and that question must be answered by evaluating *all* options Ohio provides Cleveland schoolchildren, only one of which is to obtain a program scholarship and then choose a religious school."). In addition, *Zelman* looked at various other factors to determine true private choice, including whether the program: (1) was part of the State's multifaceted attempt to improve educational opportunities, (2) allowed all schools within the district to participate, (3) only gave preference to low-income families without allowing other preferences, and (4) did not provide financial incentives to skew the program toward religious schools. 536 U.S. at 653, 122 S.Ct. 2460.

¶ 86 In contrast, the majority's analysis measures choice based on the options created by the corporate taxpayer program, not the totality of school options. Under that analysis, the majority fails to recognize that the corporate tax credit program negates or reduces private choice for a number of reasons. First, *Zelman* and its progeny are primarily concerned with parental choice, not the

choice of some other entities like corporations.[27] Second, parental choice is severely limited because the STOs are in complete control over which schools are able to participate. Third, the corporate tax credit program primarily increases the availability of religious schools to parents who subscribe to certain religious beliefs and prefer to send their children to schools of that religion. It does not increase options for all parents. Fourth, in reviewing the other *Zelman* factors, there is at least some evidence here that the tax credit program was not part of a multifaceted attempt by the State to improve educational opportunities. *Supra* ¶¶ 64–71.

¶ 87 Despite that failure in analysis, if we apply the *Zelman* test for the private choice criterion, the scheme here meets that factor. In *Zelman*, true private choice is present when parents have almost total control over where to send their child to school among a broad range of options. 536 U.S. at 664, 122 S.Ct. 2460. In that program, "[w]here tuition aid is spent depends solely upon where parents who receive tuition aid choose to enroll their child." *Id.* at 646, 122 S.Ct. 2460. Further, the Court describes a true private choice program as one "[i]n which government aid reaches religious schools only as a result of the genuine and independent choices of private individuals." *Id.* at 649, 122 S.Ct. 2460 (citation omitted). The phrase "independent choices of private individuals" means choices made by parents or students. For example, in *Zobrest*, the Court stated, "By according parents freedom to select a school of their choice, the statute ensures that a government-paid interpreter will be present in a sectarian school only as a result of the private decision of individual parents." 509 U.S. at 10, 113 S.Ct. 2462. In *Witters*, "[a]id ... that ultimately flows to religious institutions does so only as a result of the

---

**26.** In dissent, Justice Souter described the majority's definition of "choice" in *Zelman* as "diluted." 536 U.S. at 702, 122 S.Ct. 2460 (Souter, J., dissenting). He wrote that "if the choice of relevant alternatives is an open one, proponents of voucher aid will always win, because they will always be able to find a 'choice' somewhere that will show the bulk of public spending to be secular." *Id.* at 701, 122 S.Ct. 2460. The Arizona system underscores the accuracy of that analysis. Nevertheless, we are bound by the majority's opinion in *Zelman*.

**27.** In *Mueller,* the program allowed any parent to take a tax deduction for school-related expenses at any elementary or secondary school in Minnesota. 463 U.S. at 391, 103 S.Ct. 3062. In *Witters,* the voucher program allowed visually-impaired students to choose any school which offered vocational training in Washington. 474 U.S. at 483, 106 S.Ct. 748. In *Zobrest,* the program allowed hearing-impaired students to use a government funded sign-language interpreter at the school of their choice. 509 U.S. at 10, 113 S.Ct. 2462.

genuinely independent and private choices of aid recipients." 474 U.S. at 488, 106 S.Ct. 748. The "aid recipients" in *Witters* were students. Finally, in *Mueller*, the Court found a valid program because of the "numerous, private choices of individual parents of school-age children." 463 U.S. at 398, 103 S.Ct. 3062.

¶ 88 That requirement is met here because of the range of schools available to parents. Parents can choose to continue to send their children to public schools, including charter schools. Alternatively, parents can send them to any one of many private schools at their own expense or using tax credit funds to offset that expense.

## IV. Conclusion

¶ 89 *Zelman* established that four requirements must be met for an indirect aid program to pass muster under the Establishment Clause. Here, there is a fact question whether the predominate intent was secular or was aimed at promoting religion. Additionally, based on the record presented, the program is neither entirely neutral with respect to religion nor does it provide aid to a broad class of individuals defined without reference to religion. Accordingly, I would reverse the judgment of the superior court and remand for further proceedings consistent with my conclusions.